IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Yeilimar Torres Vilchez, Petitioner, | |
| v. | Case No. 22-cv-3806 |
| Jesus Gregorio Tovar Aranguren, Respondent. | Judge Mary M. Rowland |

### MEMORANDUM OPINION AND ORDER

Petitioner Yeilimar Torres Vilchez (Torres) has filed a petition against Respondent Jesus Gregorio Tovar Aranguren (Tovar), seeking the return of the parties' minor daughter, I.V.T.T ("the child") to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (Oct. 25, 1980) (the "Convention") implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. As relevant here, the Convention provides that a parent whose child has been wrongfully removed or retained in the United States may petition for the child's return to his or her country of habitual residence.

The Petition was filed on July 22, 2022. The Court held the trial on the Petition on Aug. 17, 2023, during which, over the course of four hours, three witnesses testified.[1] In accordance with Federal Rule of Civil Procedure 52, this Memorandum Opinion and Order sets forth the Court's findings of fact and conclusions of law.

---

[1] Petitioner initially was unable to execute service on Respondent, resulting in a delay. Dkt. 12. The Court then granted the parties' request for time to take depositions. Dkt. 24. The Court then granted Respondent's request for psychological evaluation of himself and the child. Dkt. 34. The Court granted another continuance to allow Petitioner to attempt to obtain a visa to appear in person for the trial

1

For the reasons stated herein, the Petition for Return of Child to Mexico [1] is granted. The Court concludes that the child was a habitual resident of Mexico at the time of the wrongful removal to the United States, that Torres had and was exercising custody rights under Mexican law, and Tovar did not establish the "grave risk" exception in this case.

**I.  Standard of Decision**

Where, as here, an action is "tried on the facts without a jury," Fed. R. Civ. P. 52 requires the Court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a); *see also Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012) ("the trier of fact must decide whom to believe (and how much to believe) on the basis of coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues [as] to falsity and veracity.") The Court must "explain the grounds" of its decision and otherwise demonstrate a "reasoned, articulate adjudication." *Aprin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

Here, in adjudicating Torres' claim, the Court has considered the totality of the admissible evidence presented at trial. The Court has carefully considered the weight to be accorded the evidence, including the credibility of each witness. In assessing credibility, the Court had the opportunity to observe[2] and has considered, among

---

and subsequently, another continuance so that Petitioner could arrange for Spanish interpreter services for the trial. Dkts. 35, 37. Although the parties did not object to these delays, the Court regrets them as they are inconsistent with the Convention.

[2] Two of the three witnesses, Tovar, and Dr. Simone, testified live in the courtroom. The third witness, Torres, testified via video from Mexico. Dr. Simone's testimony will be discussed *infra*.

other things, each witness' demeanor and facial expressions; intelligence; ability and opportunity to see, hear, or know the matters about which the witness testified; memory; potential for bias; and the believability of the witness' testimony considering the other evidence presented. *See, e.g., Anderson v. City of Bessemer, N.C.*, 470 U.S. 564 (1985) (applying the well-settled principle that the trial judge is in the best position to assess witness credibility).

The Court has additionally considered the parties' arguments and the applicable law. This decision on the merits incorporates the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52.

## II. The Standard for Evidentiary Rulings

Under 22 U.S.C. § 9005, any documents submitted with a petition seeking relief under the Hague Convention or any documents "provided after" the petition's submission which "relate[ ] to" the petition require no authentication to be admissible in court. Several courts in this district have allowed foreign custody court documents and excerpts of foreign law to be admitted without being authenticated. *See, e.g., Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 907 & n.4 (N.D. Ill. 2015); *Ho v. Ho*, No. 20-cv-6681, 2021 WL 2915161, *2 (N.D. Ill. July 12, 2021); *In re Interest of Zarate*, No. 96-cv-50394, 1996 WL 734613, at *2 (N.D. Ill. Dec. 23, 1996). Accordingly, the Court did not reject any proffered exhibits on the grounds that they had not been authenticated, and neither party objected to this practice.

The Court did, however, apply the Federal Rules of Evidence—as most other courts have done in the context—to determine what documents and other evidence

was admissible and for what purposes. *See e.g., Schwartz v. Hinnendael*, No. 20-cv-1028, 2020 WL 5531564, at *2 (E.D. Wis. Sept. 15, 2020) (determining in a Hague Convention case whether expert was admissible under the Federal Rule of Evidence 702); *Luedtke v. Luedtke-Thomsen*, No. 1:12-cv-750-WTL-TAB, 2012 WL 2562405, at * 1 (S.D. Ind. June 29,2012) (stating that Federal Rules of Evidence apply to petition hearings).

    A.    **Dr. James Simone Testimony**

During the trial, Tovar proffered the testimony of Dr. Simone, a forensic clinical psychologist hired to conduct a psychological evaluation of Tovar and the child. Torres objected to the relevance of Dr. Simone's testimony, and the Court allowed Tovar to proffer Dr. Simone's testimony. Dr. Simone testified that he evaluated Tovar and I.V.T.T. Tr. 116: 1-3. Specifically, he testified that I.V.T.T. did not receive the required vaccinations according to child vaccine protocol in the United States, and that I.V.T.T. was held back by a year when she started school in the United States. Tr. 119: 2-10; Tr. 119: 11-20. He concluded that I.V.T.T seemed to be happy and thriving in her current situation and he had no evidence that would indicate that she needed to be removed from that situation. Tr. 120: 22–121: 2. He admitted that, in reaching this conclusion, his evaluation and report followed the best-interests-of-the-child standard that is typical in child custody cases. Tr. 127: 12-17.

This Court is not deciding which parent should have custody of the child, but rather, as the Seventh Circuit described, deciding "which court system should resolve

the underlying issue of child custody". *Walker v. Walker,* 701 F.3d 1110, 1123–24 (7th Cir. 2012). The Court thus finds Dr. Simone's proffered testimony irrelevant. Counsel asked him if the child would face "grave risk" if returned to Mexico. He opined that she would because: "she wasn't getting proper medical care and wasn't getting proper education…" Tr. 128: 12-13. However, this opinion was limited to her not receiving vaccines according to protocol and being behind in school.

> Q. And does the information that you examined suggest to you that because of the vaccination -- lack of vaccinations and because of the negative education effort, whatever that was or where the child was when they brought to the United States, do you view that as the child was in grave danger prior to coming to the United States?
>
> A. As reported to me by her physician and her educator, that she wasn't getting proper medical care and wasn't getting proper education, yes, I would -- I would think that that would cause grave danger.

Tr. 128: 5-14.

The Court finds this opinion is not relevant to the inquiry required to determine "grave risk."

### III. Findings of Fact[3]

Torres is 26 years of age and a permanent resident of Mexico where she currently resides and works as a receptionist. [54] at ¶1; Dkt. 1 at ¶ 7. She was born in Venezuela and was living in Venezuela in 2014 where she met and engaged in a non-marital romantic relationship with Tovar who is 32 years of age and was also born in Venezuela. [54] at ¶¶ 2-5. Tovar currently lives in Chicago with his partner, Ruth Chacon, and the child, and he works as a delivery driver for Amazon Flex. Tr.

---

[3] Certain facts were agreed to by the parties. *See* Court Exhibit 1 [54].

at 130:20 – 131:15.[4] Torres and Tovar have an 8-year-old daughter together, I.V.T.T. born on July 8, 2015. [54] at ¶ 4. Torres and I.V.T.T. lived in Venezuela with Petitioner's mother. Tr. 89: 11-14.

In April 2018, Torres emigrated from Venezuela to Querétaro, Mexico to request refugee status. [54] at ¶ 6. There, she submitted her request, and it was approved. *Id*. By June 2018, Torres had saved up enough money, after three months of working in Mexico, to pay the airfare for Tovar and I.V.T.T. to join her in Mexico. Dkt. 1 at ¶12. Torres had given Tovar a permit allowing for him to travel to Mexico with the child, that was only valid for one year. Tr. 89: 21-25.

For a time, the parties lived together in Mexico in a home Torres rented, and in March of 2019, Tovar and the child were awarded permanent residency status in Mexico. Tr. 90:5-11; [54] at ¶¶ 7–8. At this time, Torres worked in a restaurant and was the primary provider for I.V.T.T. as Tovar was not employed.[5] Tr. 90:12-13; Tr. 91:19–92:5.

After some time, Torres and Tovar separated, during which time, Tovar had no contact with the child. Tr. 95:9-16. Subsequently, the parties entered an arrangement where the parties would split their time with the child. *Id*; Dkt. 1 at ¶ 19. In addition to living apart during this time, Torres and Tovar were not able to communicate and

---

[4] In the interest of issuing an expedited decision, the parties agreed the Court would cite to the rough transcript from the trial. This is cited as Tr. at [page: line]. Petitioner's exhibits, which were admitted without objection, are cited as Pet. Ex. _.

[5] The parties accuse each other of engaging in prostitution during this time. The Court finds that these facts are irrelevant to its inquiry under the Convention. These are precisely the sort of arguments that are not within the ambit of the courts under the Convention. *See Norinder v. Fuentes,* 657 F.3d 526, 530 (2011) ("…we do not sit to resolve a messy domestic conflict.").

they arranged for I.V.T.T. to be exchanged whilst at school. Tr. 96: 3-10. Each week, each parent would have 3 or 4 nights with I.V.T.T. and drop the child off at school for the exchange. *Id*. Torres was living with her current partner, Carlos Apodaca, at the time, and Tovar was living alone in an apartment. Tr. 94: 18-24; Tr. 138:25–139:3. It is undisputed that both parents lived in Mexico. *Id*.

This arrangement continued until July 23, 2021, the last day that Torres saw I.V.T.T. Tr. 96:11-24. As it was the summer break, the parties agreed to exchange the child at the OXXO store in Querétaro, Mexico. Dkt. 1 at ¶ 20. According to Torres, Tovar was to have the child until July 26, 2021. *Id*. However, on July 26, 2021, Tovar did not return the child. Dkt. 1 at ¶ 21. Torres tried to contact Tovar and Tovar's family about I.V.T.T.'s whereabouts. *Id*. None of Torres's communication attempts were successful. *Id*.

Within weeks, Torres went to the local courts in Mexico to seek return of the child. *Id*. at ¶ 22. On August 2, 2021, she petitioned the Family Court of the Superior Court of Justice of the State of Querétaro, Mexico, seeking provisional custody of the child. Tr. 101:21–102:4. On August 4, 2021, that court granted her provisional custody. Dkt. 1 at ¶ 22; [54] at ¶ 25. After no response from Tovar, on August 25, Torres again went to the Mexican courts. *Id*. at ¶ 23. On September 13, 2021, the Third Family Court of the Superior Court of Justice of the State of Querétaro, Mexico, granted Torres custody of I.V.T.T. as well as child support from Tovar. *Id*; [54] at ¶ 26. The Third Family Court ordered Tovar to immediately return the child. Tr. 102: 12-15.

7

Torres learned that Tovar and her daughter were in Chicago through a social media post of a member of Tovar's family on September 30, 2021. Tr. 102:16-22; Dkt. 1 at ¶ 24. Having learned their location, Torres again sought assistance from the Mexican courts, receiving an order for the return of the child by December 16, 2021. Tr. 102: 25–103:2. Respondent did not comply. *Id*.

On April 1, 2022, Torres submitted her application under the Convention to the government of Mexico, and it was forwarded to the United States Central Authority. [54] at ¶ 32. On April 27, 2022, Tovar received a letter from the United States Department of State concerning Torres's application under the Convention. *Id*. at ¶ 33.

Torres and Tovar each testified that the child lived in Mexico prior to her removal to the United States. Tr. 147:10-20; Tr. 101:7-10; [54] at ¶ 15. Torres testified that the child lived with her in Mexico up until the removal. Tr. 101:7-10. Torres testified that I.V.T.T. has a bedroom in Torres's apartment where she slept that has her toys and clothing. Tr. 91:5-13. While in Mexico, Torres had the child enrolled in preschool and provided necessary medical care. Dkt. 1 at ¶¶ 32f-32g. Finally, Torres supported I.V.T.T. financially and emotionally, and she continues to seek her return to Mexico. Tr. 103:12–104:1; Tr. 104:3-5; [54] at ¶ 42. On July 22, 2022, Petitioner filed her petition and application under the Hague in this Court seeking the return of her minor child. Dkt. 1.

Tovar testified that on July 25 or July 26, 2021, he and I.V.T.T. left Mexico for the United States. Tr. 140: 20-23. He admitted that they entered the United States

8

illegally and are currently seeking political asylum, however the application remains pending. Tr. 131:16-22. Tovar testified that he received a custodial document from Venezuelan courts granting him absolute custody of I.V.T.T. Tr. 133:2-10. He relied heavily on this testimony to argue that Petitioner surrendered custody of I.V.T.T. to him when she left Venezuela. The Court does not find Tovar's testimony credible. Tovar did not provide any documentation supporting that statement and did not disclose any such documents to opposing counsel during discovery. And even if a Venezuelan court ordered custodial rights to Tovar in 2018 when Torres immigrated to Mexico, that does not address the question under the Convention of the child's habitual residence. This is a document that should be presented to the court of habitual residence to determine custody. Finally, it is not credible that a person who is sharing custody of a child (in Mexico) for three years would then decide to leave the country without notice to the other parent based on an alleged court document (from Venezuela) dated three years earlier without discussing the decision with the co-parent. Common sense dictates that is not credible.

Tovar also testified that Torres did not object to him to taking I.V.T.T. to the United States. Tr. 141:24 – 142: 5. Specifically he testified that when he informed Torres that he was bringing the child to the United States, she told him that he "should do whatever [he] wanted because she was going to live her life with her partner." *Id*. However, the Court does not find this credible. Torres' actions are not those of a parent who has ceded complete authority of their child. She sought return of the child many times from Mexican courts and eventually filed a Hague petition

9

for the return of the child. Additionally, if Torres gave Tovar full authority to bring the child to the United States permanently, as he testified, why did she not provide a written permit just as she had done when Tovar and I.V.T.T. were travelling from Venezuela to Mexico? Tr. 144: 7-13. The Court is not persuaded by this testimony.

Nearing the end of his testimony, Tovar testified he left Mexico because of alleged abuse of I.V.T.T. Specifically, Tovar testified that he brought I.V.T.T. to the United States after she reported that Torres's partner, Carlos Apodaca, had put his hands underneath the child's underwear. Tr. 140:24–141:4. Again, Tovar did not provide any documentation of this alleged abuse. He did not make any police report in Mexico about this incident. It is troubling to the Court that Respondent testified that he entered the United States illegally and has filed an asylum petition based on political asylum. Tr. 144:20–145:3. Now he has testified under oath that he left Mexico because of abuse to his child. Overall, the Court does not find Tovar credible.

## IV. Conclusions of Law

### A. Legal Framework

The Hague Convention, a treaty to which both the United States and Mexico are signatories,[6] is "[t]o address the problem of international child abductions during domestic disputes," and its core premise is that "the interests of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 140 S. Ct. 719, 723

---

[6] *See United States Hague Convention treaty Partners*, U.S. Department of State—Bureau of Consular Affairs,https://travel.state.gov/content/travel/en/International-Parental-Child Abduction/abductions/hague-abduction-country-list.html (visited Aug. 15, 2023)

10

(2020) (internal quotation marks and citation omitted). The Convention's return requirement is a "'provisional' remedy that fixes the forum for custody proceedings." *Id.* Accordingly, a Hague Convention case is not a child custody case, and the merits of the child custody case are to be reserved for the courts in the country of the child's habitual residence. *Id.* at 723, 727.

"The central question in any petition seeking the return of a child under the Hague Convention and ICARA is whether the child who is the subject of the petition has been 'wrongfully' removed or retained within the meaning of the Convention." *Redmond v. Redmond*, 724 F.3d 729, 737 (7th Cir. 2013). Under the Convention, a removal or retention is wrongful where (a) "it is in breach of rights of custody attributed to a person, an institution[,] or any other body, either jointly or alone, under the law of the State (b) in which the child was habitually resident immediately before the removal or retention"; and (c) "at the time of removal or retention[,] those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention, art. 3. Torres acknowledges these are the three elements that she has the burden to establish by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1). If she establishes a wrongful removal or retention, the burden shifts to Tovar to show that one of the exceptions to the return requirement applies. 22 U.S.C. § 9003(e)(2).

In this case, Tovar raises two arguments. First, he argues that Torres fails to establish by a preponderance of the evidence that she had custodial rights over the child and argues that he received a document granting him absolute custody over

11

I.V.T.T from a Venezuelan court prior to their immigration to Mexico. Second, Tovar argues that if the Court were to find that Petitioner met her burden, an applicable exception applies as set forth in Article 13(b) of the Convention. This provides that a child's return is not required if a respondent establishes that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Tovar must establish this exception by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

Ultimately, the Court must answer these four questions to determine if a removal was wrongful.

(1) When did the removal or retention of the child occur?
(2) In what State was the child habitually resident immediately prior to the removal or retention?
(3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence?
(4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention?

*Redmond*, 724 F.3d at 737-38.

The parties do not dispute when the removal occurred. Thus, as to the first question, the removal occurred on July 25 or July 26, 2021, when Tovar removed I.V.T.T. from Mexico. Tr. 140: 20-23. The Court will now address Torres's *prima facie* case and Tovar's affirmative defense in turn below.

### B. Petitioner's *Prima Facie* Case

#### i. Habitual Residence

The Convention itself does not define "habitual residence." *Monasky,* 140 S. Ct. at 726. But recently, the Supreme Court in *Monasky* gave guidance on what courts should consider in identifying a child's habitual residence. Interpreting the statute's plain language, the Supreme Court explained that "[a] child 'resides' where [he] lives," and that a residence is habitual only when it is "more than transitory," which will be necessarily fact specific. *Id.* Further, the Supreme Court stated that the Convention's explanatory report and the treaty's negotiation and drafting history also confirm a fact-based approach and that, for a residence to be habitual, "some degree of integration by the child in a social and family environment" is required. *Id.* (internal quotation marks and citation omitted). Overall, the place "where a child is at home, at the time of removal or retention," is the child's habitual residence. *Id.* Determining a child's habitual residence is a "fact-driven inquiry" that will "depend[] on the specific circumstances of the particular case." *Id.* at 727.

In *Monasky*, the Supreme Court acknowledged that Courts of Appeals had emphasized different factors in determining a child's habitual residence, with some preferring to focus on acclimatization, others placing greater weight on the parents' shared intentions, and some rejecting any rigid formula. *Id.* at 725–26. Ultimately, the Supreme Court did not explicitly endorse or reject any lower court's approach. Instead, it concluded that the "bottom line" was that "there are no categorical requirements for establishing a child's habitual residence—least of all an actual agreement requirement for infants." *Id.* at 728. Therefore, as instructed by the

13

Supreme Court, this Court determines the child's habitual residence by considering the "totality of the circumstances." *Id.* at 723.

The Court finds that the child's habitual residence immediately prior to removal was Mexico. It is not disputed that I.V.T.T. lived in Mexico for three years continuously immediately prior to her removal. She attended school, saw medical providers and received financial and emotional support from Torres (and Tovar) in Mexico. She lived with both of her parents on a shared basis in Mexico. She is a permanent resident of Mexico. The family, including some extended family members, showed every intent of remaining in Mexico.

Tovar testified that Torres consented to I.V.T.T. residing in the United States. For the reasons stated previously, the Court found this testimony not credible. Tovar's lack of any documentary support for this argument allows the Court to make short shrift of it. There is no basis to find that the two parties to this action had any shared intention for I.V.T.T. to immigrate to the United States illegally. Accordingly, the Court finds that the child's habitual residence immediately prior to the removal was Mexico.

### ii. Custody Rights

A removal or retention is only "wrongful" under the Hague Convention if it is in violation of a petitioner's "rights of custody," which "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott v. Abbott*, 560 U.S. 1, 9 (2010) (internal quotation marks omitted). Torres bears the burden. The Court consults the law of the country of

14

habitual residence to determine a petitoner's rights of custody. *See id*. at 10; *Norinder,* 657 F.3d at 533. The third and final element is that, at the time of the removal or retention, a petitioner must have been exercising those custody rights or would have been exercising them if not for the removal or retention. Hague Convention, art. 3(b). "The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Walker*, 701 F.3d at 1121 (internal quotation marks and citation omitted).

Tovar argues that he was granted sole custodial rights over I.V.T.T. prior to Torres immigrating to Mexico from Venezuela in 2018. Specifically, he testified that Torres presented him with two documents. The first document is not disputed. Torres gave Tovar a permit that allowed Tovar to travel to Mexico with the child. The second document, Tovar testified was a document that granted him full custody of I.V.T.T. from a Venezuelan court. Tovar did not offer this document into evidence.[7]

Even if this Court were to consider Tovar's argument, Tovar's actions following his and I.V.T.T.'s arrival in Mexico would serve to negate his exercise of sole custody. He does not dispute that I.V.T.T. lived with both he and Torres as well as with Torres alone at the time of their separation. He does not dispute that Torres sought and

---

[7] Dr. Simone, whose testimony the Court excluded as irrelevant, testified that Tovar read a Spanish language document to him that purported to be an order from a Venezuelan court granting him full custody. Tr. 119: 21–120:8. Aside from being referenced in Dr. Simone's report, the document was not produced to Torres' counsel. Tr. 167: 1-5. The Venezuelan court order itself was not introduced into evidence. The Court gives it no weight.

15

obtained three court orders granting her custody and child support concerning I.V.T.T. in Mexico. He does not dispute that Torres was actively exercising her custody rights whilst they were in Mexico. Thus, he was not exercising his sole custody rights in Mexico. Given the totality of the facts, the Court does not consider the alleged Venezuelan court order as relevant (if it even exists) to this inquiry that focuses on custodial rights present *at the time of the wrongful removal* in the child's habitual residence. *See Abbott v. Abbott*, 560 U.S. 1, 9 (2010). The Court finds Torres was exercising her custodial rights concerning I.V.T.T. at the time of the removal.

Petitioner has met her burden of establishing a *prima facie* case of wrongful removal under the Convention. The Court now turns to Respondent's asserted affirmative defense.

### C. Respondent's Affirmative Defense – Grave Risk

"Article 13(b) of the Convention and [22 U.S.C. §9003(e)(2)(A)] provide that when a respondent demonstrates by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation, the automatic return required by the Convention should not go forward." *Norinder,* 657 F.3d at 534. Given the concern with comity among nations, the defense must be interpreted narrowly. *Van De Sande v. Van De Sande,* 431 F.3d 567, 571–72 (7th Cir. 2005). "Because the [federal] court in this sort of case is responsible for determining which country's courts should adjudicate the domestic dispute and not resolving the dispute itself, we have stressed that the risk of harm must truly be grave." *Norinder,* 657 F.3d at 535.

16

"The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Van De Sande*, 431 F.3d at 570.

Tovar argues that I.V.T.T. would be subject to grave risk should she return to Mexico.[8] He argues that I.V.T.T. would receive poor medical care as well as a poor education should she return. Specifically, he states that I.V.T.T. did not receive the required vaccinations according to U.S. child vaccine protocol and that I.V.T.T. was held back by a year when she started school in the United States. Finally, he argues that Petitioner's partner, Carlos Apodaca abused I.V.T.T. when he put his hands underneath her underwear and as such, I.V.T.T is subject to risk of further abuse from him should she return to Mexico.

As to the first two arguments, the only evidence Tovar relies on is the proffered testimony from Dr. Simone, who reviewed two reports that led him to a determination that the child would be in grave risk should the child return to Mexico. Tr. 128: 5-14. The first is a medical report from I.V.T.T.'s medical provider in the United States stating that she was not up to date on her vaccine protocol. Tr. 119: 2-10. The second is a report from her school in the United States holding I.V.T.T back one year. Tr. 119: 11-20. First, these documents were not offered into evidence. More importantly, even if they were, while they may pertain to the best interests of the child, they do

---

[8] The Court notes that Tovar did not properly raise this defense. In the year that this case has been active, Tovar did not respond to Torres' Petition. Tovar's argument that he was not instructed to respond [45] does not negate his duty to raise an affirmative defense at trial. That said, the Court denied Torres' motion in limine to bar any affirmative defense [50] allowing the parties to litigate the case on the merits.

17

not meet the standard of "grave risk" as defined by the Convention. As such, Tovar has failed to meet his burden of establishing this defense.

As to the third argument, Tovar raised this argument for the first time during his testimony at trial. He does not offer any evidence to corroborate this allegation except to testify that he reported it to Dr. Simone. Tr. 151:25–152:17. Importantly, Dr. Simone did not testify that he was told about this when he was questioned about the best interest of the child or a potential "grave danger" to the child.[9] All of these lead the Court to find this testimony offered by Tovar concerning the alleged abuse of I.V.T.T. does not establish by clear and convincing evidence that the child faces a grave risk if she is returned to Torres.

Tovar has not met his burden of proving by clear and convincing evidence the affirmative defense of grave risk.

## V. Conclusion

For the stated reasons, the Court finds that Petitioner has met her burden to show that I.V.T.T. was wrongfully removed and that Respondent did not meet his burden to show that any affirmative defenses applied. Accordingly, the Court finds that the child must be returned to Mexico and grants the Petition for the return of the child. [1].

In light of the delay of this matter, counsel are directed to meet and confer by **August 25, 2023,** and determine reasonable conditions and timing for the

---

[9] Tovar's counsel, as an officer of the Court, verified with Dr. Simone, that Tovar had reported this information to Dr. Simone. The Court accepts counsel's representation. The fact that Dr. Simone did not raise it during his testimony speaks volumes.

18

effectuation of this decision. By **noon** on August 25, 2023, the parties shall email a proposed order to this Court's proposed order inbox effectuating this ruling (specific as to time, manner, and date of return, and who is responsible for arranging and paying for the logistics of the child's return). The Court has allowed a several-days period to avoid an abrupt transition for the child.

A telephonic hearing is set for **August 25, 2023, at 1:00 p.m**. for entry of a final order implementing this decision. The issue of Petitioner's request for costs [Dkt. 1 at 16], 22 U.S.C. § 9007(b)(3), will also be addressed during that hearing. The parties shall be prepared for prompt compliance with this decision, as required by the Hague Convention.

E N T E R:

Dated: August 23, 2023

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge

19